**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DEBRA THOMPSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:17-cv-01456-ACA** |
| | } | |
| **QCHC, INC. and CLIFF** | } | |
| **HENDERSON,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Debra Thompson alleges that Defendant Cliff Henderson sexually harassed her and that Defendant QCHC, Inc. ("QCHC") terminated her employment for complaining about Mr. Henderson's conduct.  Ms. Thompson asserts claims against QCHC for hostile work environment and retaliation under Title VII.  She asserts a claim against Mr. Henderson for invasion of privacy under state law.

Before the court are Defendants' motions for summary judgment.  (Doc. 34; Doc. 40).  For the reasons explained below, the court **GRANTS** QCHC's motion for summary judgment (doc. 34), and in the absence of an independent basis for jurisdiction over Ms. Thompson's state law invasion of privacy claim against Mr.

Henderson, the court will decline to exercise supplemental jurisdiction over the claim.

## I.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.     BACKGROUND

QCHC is a Birmingham-based company that contracts with local governmental entities to provide healthcare services to city and county correctional facilities. (Doc. 34-1 at ¶ 2). QCHC hired Ms. Thompson in March 2015 as a part-time nurse and assigned her to work at the City of Trussville's Municipal Jail. (Doc. 34-1 at ¶ 5; Doc. 34-2 at 8). She remained on that assignment until the spring of 2016, when QCHC transferred her to another of the facilities it served. (Doc. 34-2 at 14).

When Ms. Thompson was hired, her supervisor was Ashlei Porter, Chief Nursing Officer for QCHC at that time. (Doc. 34-1 at ¶ 6). According to Ms. Thompson, Stacie Thompson ("Stacie") became her supervisor in the spring of 2016. (Doc 34-2 at 11). Stacie was a site administrator for the St. Clair County Jail, another facility where QCHC provides healthcare services. (Doc. 34-2 at 11; Doc. 34-4 at ¶ 1). Stacie was never formally assigned responsibility over the Trussville Jail, but she did cover shifts there. (Doc. 34-4 at ¶ 2). Victoria Singleton, QCHC's Regional Director of Nursing for Alabama, also supervised Ms. Thompson's work at the Trussville Jail beginning in the spring of 2016. (Doc. 34-1 at ¶ 6).

Ms. Thompson alleges that Cliff Henderson sexually harassed her while she worked at the Trussville Jail. (Doc. 34-2 at 25). Mr. Henderson was a police officer who worked at the Jail, but he was not employed by QCHC. (Doc. 34-2 at 22). Ms. Thompson first met Mr. Henderson when he came into the office during her training and would "laugh and talk and flirt and cut up and get in the way." (Doc. 34-2 at 22).

In July 2015, Ms. Thompson and Mr. Henderson began texting frequently. (*See generally* Doc. 34-5). As time passed, the exchanges became increasingly flirtatious. (*See* Doc. 34-5 at 3-5, 137, 140-142). On one occasion, Ms. Thompson texted Mr. Henderson pictures of her feet after a pedicure, and Mr. Henderson

replied that she had "sexy toes." (Doc. 34-2 at 26-27). In another exchange, Mr. Henderson explained that he was so tired the night before that he never took his clothes off. (Doc. 34-5 at 51). Mr. Henderson continued, "I don't wear anything when I go to bed, but I still had my cop suit on lol." (Doc. 34-5 at 51). Ms. Thompson replied, "lol . . . you are hilarious . . . I love it!" (Doc. 34-2 at 30; Doc. 34-5 at 51). In response to a number of Mr. Henderson's text messages, Ms. Thompson told Mr. Henderson that she either missed seeing him or was looking forward to seeing him at work. (Doc. 34-5 at 29, 44).

In addition to the texts, Mr. Henderson and Ms. Thompson verbally communicated. During some conversations, Mr. Henderson referred to Ms. Thompson as "Miss 44" or "My 44 girl." (Doc. 34-2 at 25). Ms. Thompson believes the reference to "44" was in relation to her breast or bra size, although she denies giving Mr. Henderson her breast or bra size, and she denies that "44" is the correct size. (Doc. 34-2 at 25). Mr. Henderson occasionally referred to Ms. Thompson as "Hottie Nurse," but Ms. Thompson testified that Mr. Henderson was joking on some occasions. (Doc. 34-2 at 26). Ms. Thompson never told Mr. Henderson that she was offended by the reference to "Hottie Nurse" and never told him to stop referring to her as "44." (Doc. 34-2 at 26).

Mr. Henderson also gave Ms. Thompson a few shoulder/back massages. (Doc. 34-2 at 33). Ms. Thompson texted Mr. Henderson on one occasion and said

that the massage "felt good." (Doc. 34-2 at 28). In another text message, Mr. Henderson suggested that he could give a better massage if Ms. Thompson took off her shirt. (Doc. 34-5 at 131). During one of the massages, Mr. Henderson "pushed back" Ms. Thompson's scrubs and "put[] his hands onto [her] skin." (Doc. 34-2 at 28). Ms. Thompson "got up and felt very uncomfortable." (Doc. 34-2 at 28). Ms. Thompson never complained to Mr. Henderson about the massages, and she never asked him to stop. (Doc. 34-2 at 33).

Ms. Thompson testified that Mr. Henderson's conduct caused stress, but the stress did not prevent her from providing patient care to inmates at the Trussville Jail. (Doc. 34-2 at 46-47). In fact, Ms. Thompson sought to work more hours at the Trussville Jail. (Doc. 34-2 at 47). She asked QCHC to approach the City of Trussville and ask if the contract could be amended to allow for a full-time nurse position at the jail. (Doc. 34-2 at 13-14, 17). After the City of Trussville rejected the idea, Ms. Thompson transferred to another QCHC location where she could work more hours. (Doc. 34-2 at 14).

After her transfer, Ms. Thompson returned to the Trussville Jail "a couple of times" to check on inmates there. (Doc. 34-2 at 38). One day in June 2016, Stacie asked Ms. Thompson whether she wanted to go check on the inmates at the Trussville Jail. (Doc. 34-2 at 38). Ms. Thompson told Stacie that she did not want to go back to the Trussville Jail because Mr. Henderson made her "feel

uncomfortable" and "says sexual things."  (Doc. 34-2 at 38).  Ms. Thompson showed Stacie some of the text messages from Mr. Henderson, and Stacie responded, "Oh, gosh."  (Doc. 34-2 at 38).  This was the first time that Ms. Thompson reported Mr. Henderson's conduct to QCHC management, and after Ms. Thompson told Stacie about Mr. Henderson's conduct, QCHC did not require her to go back to the Trussville Jail.  (Doc. 34-2 at 38).[1]

On June 28, 2016, a new inmate asked Ms. Thompson for blood pressure medication.  (Doc. 34-2 at 39; Doc. 34-4 at ¶ 4).  Ms. Thompson gave the inmate one dose of prescription blood pressure medication without confirming that the inmate had a prescription for the medication and without getting approval from a QCHC doctor as required per QCHC policy.  (Doc. 34-3 at 2; Doc. 34-4 at ¶¶ 4-6).  Ms. Thompson gave the prescription medication to the inmate without checking the inmate's blood pressure and without documenting the event in the inmate's medical file.  (Doc. 34-4 at ¶ 5).  Later that day, Ms. Thompson called Stacie and told her what she did.  (Doc. 34-2 at 39).  According to Ms. Thompson, Stacie told her, "It's okay this time, but don't do it anymore, just always call the doctor." (Doc. 34-2 at 40).

---

[1] In addition to Stacie, Ms. Thompson told two QCHC co-employees about Mr. Henderson's conduct.  (Doc. 34-2 at 33-38).  One of Ms. Thompson's co-employees told her to report Mr. Henderson's conduct to his boss at the Trussville Jail, but Ms. Thompson did not do so.  (Doc. 34-2 at 36-37).

Stacie reported Ms. Thompson's actions to Ms. Singleton. (Doc. 34-4 at ¶ 7). Ms. Singleton asked Stacie about Ms. Thompson's overall work performance, and Stacie told her that there were other problems. (Doc. 34-4 at ¶ 7). Ms. Singleton asked Stacie to prepare a disciplinary write up for the blood pressure medication incident and to submit a written report of other performance issues. (Doc. 34-4 at ¶ 7). On July 6, 2016, Stacie issued a "Notice of Disciplinary Action" to Ms. Thompson for administering medication to the inmate without taking the inmate's blood pressure and without a doctor's order in violation of QCHC policy. (Doc. 34-3 at 2). Stacie provided a written report to Ms. Singleton on July 7, 2016. (Doc. 34-4 at ¶ 7).

After receiving Stacie's report, Ms. Singleton approached Justin Barkley, QCHC's in-house counsel, with concerns about Ms. Thompson's work performance. (Doc. 34-1 at ¶ 10). Ms. Singleton and Mr. Barkley made the decision to terminate Ms. Thompson based on these performance issues, and they checked with QCHC's President, Dr. Johnny Bates, to make sure he was okay with the decision. (Doc. 34-1 at ¶ 10; Doc. 34-6 at ¶ 2). Dr. Bates gave his approval. (Doc. 34-6 at ¶ 2). Neither Dr. Bates nor Mr. Thompson were aware of any issues that Ms. Thompson had with Mr. Henderson at this time and did not learn of those issues until Ms. Thompson filed her EEOC complaint. (Doc. 34-1 at ¶ 10; Doc. 34-6 at ¶ 3).

On July 8, 2016, Mr. Barkley and Ms. Singleton called Ms. Thompson to notify her that she was being terminated. (Doc. 34-2 at 40). Stacie was not involved in the decision to terminate Ms. Thompson, and Stacie did not provide any opinion to Ms. Singleton or Mr. Barkley about Ms. Thompson's continued employment with QCHC. (Doc. 34-4 at ¶ 10). The record contains no evidence that Stacie or either of Ms. Thompson's co-employees told Ms. Singleton, Mr. Barkley, or Dr. Bates about Ms. Thompson's complaints regarding Mr. Henderson.

## III. DISCUSSION

QCHC moves for summary judgment on both of the claims that Ms. Thompson asserts against it. QCHC argues that Ms. Thompson's Title VII hostile work environment and Title VII retaliation claims fail as a matter of law because Ms. Thompson cannot establish a prima facie case for either claim. The court agrees.

### A. *Title VII Hostile Work Environment*

To establish a sexually hostile work environment claim, a plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). QCHC argues that Ms. Thompson has failed to establish the fourth and fifth elements of her claim. (Doc. 35 at 16-28).

Concerning the fourth element, the Eleventh Circuit has explained that sexual harassment does "not constitute employment discrimination under Title VII unless the conduct is sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 1245 (internal quotation marks and citation omitted) (alteration in original). "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Id.* at 1246. "The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. *Id.* (internal quotation marks omitted). QCHC challenges only the objective component. (Doc. 35 at 17).

To determine whether harassment is objectively hostile, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Smelter v. So. Home Care Servs., Inc.*, 904 F.3d 1276, 1285 (11th

Cir. 2018) (internal quotation marks and citation omitted). These factors guide the court's analysis, but "the objective element is not subject to mathematical precision." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009). The court must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). Doing so here, the court finds that Ms. Thompson has not demonstrated that Mr. Henderson's harassment was objectively hostile.

Concerning the frequency of Mr. Henderson's conduct, the evidence, viewed in the light most favorable to Ms. Thompson, demonstrates that Mr. Henderson called her a "Hottie Nurse" or some iteration of "my 44" 15 to 21 times over the course of the 16 months she was employed with QCHC. (*See* Doc. 34-2 at 25-26). In addition, Mr. Henderson gave Ms. Thompson a back or shoulder massage on four occasions during that same time period. (Doc. 34-2 at 23). The other comments that Mr. Henderson made to Ms. Thompson via text occurred intermittently between July 2015 and May 2016. (*See generally* Doc. 34-5). The frequency of this conduct falls short of what the Eleventh Circuit has found sufficient to constitute pervasive harassment. *See Smelter*, 904 F.3d at 1285 (plaintiff heard harassing comments "every day" during her two month employment with defendant); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251-54 (11th Cir. 2014) (plaintiffs heard harassing comments "every morning,"

"every day," "regularly," or "all the time"); *Miller v. Kentworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (plaintiff exposed to harassing conduct "three to four times a day" over a one month period); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that "roughly fifteen separate instances of harassment over the course of four months" was pervasive).

Even if Mr. Henderson's conduct was frequent, this "does not compensate for the absence of the other factors." *Mendoza*, 195 F.3d at 1248. And here, the evidence does not demonstrate that Mr. Henderson's conduct was severe enough to establish a hostile work environment claim. Mr. Henderson never exposed himself to Ms. Thompson, and he never discussed any graphic sexual encounters he had. (Doc. 34-2 at 32). Mr. Henderson did not proposition Ms. Thompson for sex or make any explicit sexual advances toward her. (Doc. 34-2 at 32). The conduct about which Ms. Thompson complains includes Mr. Henderson's references to Ms. Thompson as "Hottie Nurse" and "44;" his comment about him sleeping in the nude, Ms. Thompson's "sexy toes," his ability to "get [her] going," and his desire to spend the day with her; his suggestion that he considered asking Ms. Thompson to perform his prostrate exam; his sending her a picture of a family dressed up in costumes that made them appear nude; and his giving her four back/shoulder

massages and suggesting after one massage that she should take her shirt off for the next massage. (*See* Doc. 42 at 9-10).

Mr. Henderson's conduct at times may have been inappropriate and offensive, but the conduct fails to meet the severity prong required to constitute actionable sexual harassment. *Compare Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (conduct was sufficiently severe or pervasive where the plaintiff's supervisor "frequent[ly]" tried to get plaintiff to date him using "many direct as well as indirect propositions for sex" including "following her into the restroom," "repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," and "enlisting the assistance of others to hold her while he attempted to grope her") *and Miller*, 277 F.3d at 1276-77 (harassment was severe and pervasive where co-workers called plaintiff racially offensive names three to four times per day) *with Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 584-85 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (the following conduct over a six or seven month period was not sufficiently severe or pervasive: flirtatious comments such as "[y]ou are looking very beautiful"; frequent calls to plaintiff's house at night asking personal questions; one incident when plaintiff entered harasser's office when he was expecting her and he was sitting in his chair with his dress shirt off, but wearing an undershirt, and he "unbuckled his belt and pulled down his

zipper and start[ed] tucking his shirt in"; one incident where harasser placed his hand on plaintiff's inner thigh; and one incident where harasser lifted plaintiff's dress four inches and felt the hem) *and Lockett v. Choice Hotels Intern., Inc.*, 315 F. App'x 862, 866 (11th Cir. 2009) (harasser's comments to plaintiff about sexual positions, that "he would go down on [her] good," that her boyfriend "ain't F'ing [her] right, and that she needed "to get with a real guy" were not severe or pervasive).

With respect to whether Mr. Henderson's conduct was physically threatening or humiliating, Ms. Thompson does not allege and has not produced evidence that Mr. Henderson humiliated her. Ms. Thompson testified that Mr. Henderson never physically threatened her. (Doc. 34-2 at 24). And, although the four massages involve physical contact, Ms. Thompson told Mr. Henderson that one of the massages "felt good." (Doc. 34-2 at 28). Thus, the record contains no evidence that Mr. Henderson physically threatened Ms. Thompson or humiliated her, despite making her "uncomfortable" at times. (*See* Doc. 34-2 at 36).

Finally, Ms. Thompson offers no evidence that Mr. Henderson's harassment affected the performance of her job. Although Ms. Thompson testified that she suffered stress as a result of Mr. Henderson's conduct, she still was able to provide quality patient care. (Doc. 34-2 at 47). In addition, months after Mr. Henderson's conduct began, Ms. Thompson requested to work more hours at the Trussville Jail,

even though she knew that doing so meant she might interact with Mr. Henderson more frequently. (Doc. 34-2 at 47). Ms. Thompson did not file a written complaint about Mr. Henderson; she did not talk to QCHC's human resources department about Mr. Henderson; and she complained to Stacie only after QCHC transferred her to a different jail. (Doc. 34-2 at 37-38). None of this evidence suggests that Mr. Henderson's conduct unreasonably interfered with Ms. Thompson's ability to perform her job.

Viewing the evidence as a whole, the court concludes that Mr. Henderson's conduct did not alter the conditions of Ms. Thompson's employment. Accordingly, QCHC is entitled to judgment as a matter of law on Ms. Thompson's Title VII hostile work environment claim.

Because Ms. Thompson has not demonstrated that Mr. Henderson's harassment was severe and pervasive, Ms. Thompson's hostile work environment claim fails as a matter of law. Thus, the court does not address QCHC's alternative argument that Ms. Thompson has not shown a basis for holding QCHC liable. (*See* Doc. 35 at 22-38).

B.      *Title VII Retaliation*

To establish a claim for Title VII retaliation, a plaintiff must demonstrate that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected

activity and the adverse action. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). QCHC argues that Ms. Thompson cannot establish a prima facie case of retaliation because there is no evidence of a causal connection. (Doc. 35 at 27-28).

A plaintiff establishes a causal connection through facts showing "that the protected activity and the adverse action were not wholly unrelated." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999). "In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *see Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression."). The Eleventh Circuit has explained that this "requirement rests upon common sense" because "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart*, 231 F.3d at 799.

Ms. Singleton and Mr. Barkley, with Dr. Bates's approval, made the decision to terminate Ms. Thompson's employment. (Doc. 34-1 at ¶ 10; Doc. 36-6 at ¶ 2). Ms. Thompson did not complain to Ms. Singleton or Mr. Barkley about Mr. Henderson. Ms. Thompson complained to Stacie and two other QCHC

employees. (Doc. 34-2 at 34-38). Although Stacie completed a disciplinary report and provided information to Ms. Singleton about Ms. Thompson's job performance, Ms. Thompson has presented no evidence demonstrating that Stacie told Ms. Singleton about Ms. Thompson's complaints. (*See* Doc. 34-1 at ¶ 10; Doc. 34-4 at ¶¶ 7, 10; Doc. 44-1 at ¶ 3). Moreover, neither Mr. Barkley nor Dr. Bates was aware, prior to Ms. Thompson's termination, that she complained about a jail officer's conduct. (Doc. 34-1 at ¶ 10; Doc. 34-6 at ¶ 2).

Ms. Thompson argues that a causal connection exists because QCHC terminated her employment "within approximately 14 days of telling her supervisor she did not want to go back to work with Henderson at the Trussville City Jail." (Doc. 42 at 16). An employee's termination within weeks of her protected activity may be circumstantial evidence of a causal connection, but "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart*, 231 F.3d at 799.

Because Ms. Thompson has not submitted evidence showing that the decision makers knew about her complaints, Ms. Thompson has not demonstrated that a causal connection exists between the complaints and her termination, and she cannot establish a prima facie case of retaliation. *See e.g., Clover*, 176 F.3d at

1356 (reversing district court's denial of summary judgment on retaliation claim because despite being terminated one day after protected conduct, the plaintiff "failed to present sufficient evidence to establish that [the decision maker] was aware of her protected conduct"); *McCollum v. Bolger*, 794 F.2d 602, 610-11 (11th Cir.1986) (plaintiff failed to prove a prima facie case of retaliation where evidence showed that the decision maker did not know that the plaintiff engaged in protected activity).

Accordingly, QCHC is entitled to judgment as a matter of law on Ms. Thompson's Title VII retaliation claim.

## III.   CONCLUSION

For the reasons explained above, the court **GRANTS** QCHC's motion for summary judgment and **ENTERS JUDGMENT** in favor QCHC on Ms. Thompson's Title VII hostile work environment claim and Title VII retaliation claim.   The court **DISMISSES** these claims **WITH PREJUDICE**.

The only remaining claim is Ms. Thompson's state law invasion of privacy claim against Mr. Henderson.  In her complaint, Ms. Thompson did not allege that the court has diversity of citizenship jurisdiction, and she has not properly alleged her citizenship or that of Mr. Henderson.  (*See* Doc. 1).  Nor does the second amended complaint allege or establish that the amount in controversy exceeds $75,000.  (*See* Doc. 1).

In the absence of an independent basis for jurisdiction over Ms. Thompson's invasion of privacy claim, the court will dismiss the claim without prejudice pursuant to 28 U.S.C. § 1367(c). **Within 7 days of entry of this order**, Ms. Thompson shall show cause why the court has original jurisdiction over her state law claim.

**DONE** and **ORDERED** this January 8, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE